UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHY CORRIGAN,

                Plaintiff,         Civil Action No. 17-10856
                                         Honorable Arthur J. Tarnow
                                         Magistrate Judge David R. Grand

v.

NANCY A. BERRYHILL,
ACTING COMMISSONER OF
SOCIAL SECURITY,
                Defendant.
_____/

# REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 12]

Plaintiff Cathy Corrigan ("Corrigan") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying in part her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #10, 12), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

As set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Corrigan was not disabled prior to July 30, 2015 is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment **(Doc. #12)** be **DENIED**, Corrigan's Motion for Summary Judgment **(Doc. #10)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Report and

Recommendation.

## II. REPORT

### A. Background

Corrigan was 48 years old at the time of her alleged onset date of January 20, 2014. (Tr. 85-86). She completed high school and one year of college, and also completed cosmetology school. (Tr. 50, 187). Corrigan has prior work history as a cosmetologist and cook. (Tr. 50-51, 188). She worked most recently as a cook until January 20, 2014, when her "back gave out on [her]." (Tr. 51). She alleges disability as a result of her "bulging disc injury, Scheurmann's disease, degenerative disc disease, lumbar spine impairment, severe back pain, spinal stenosis, multiple joint arthritis, carpal tunnel syndrome, and herniated disc." (Tr. 186).

On February 19, 2014, Corrigan filed an application for DIB. (Tr. 93). This application was denied initially on May 17, 2014. (*Id*.). Corrigan filed a timely request for an administrative hearing, which was held on December 2, 2015, before ALJ Stephen Marchioro. (Tr. 44-84). Corrigan, who was represented by attorney Emily Walker, testified at the hearing, as did vocational expert ("VE") Kenneth Browde. (*Id.*). On January 13, 2016, the ALJ issued a written decision finding that Corrigan was not disabled prior to July 30, 2015, but then became disabled because her "age category" changed on that date, causing her to "grid out." (Tr. 15-34). Corrigan appealed the portion of the ALJ's decision finding her not disabled between January 20, 2014 and July 30, 2015, and on January 12, 2017, the Appeals Council denied review. (Tr. 1-6). Corrigan timely filed for judicial review of the final decision on March 17, 2017. (Doc. #1).

The Court has thoroughly reviewed the transcript in this matter, including Corrigan's medical record, Function and Disability Reports, and testimony as to her conditions and resulting

2

limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### B. The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps .... If the analysis

reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this sequential analysis, the ALJ found that Corrigan was not disabled under the Act prior to July 30, 2015, but became disabled on that date because of her change in "age category." At Step One, the ALJ found that Corrigan had not engaged in substantial gainful activity since January 20, 2014 (the alleged onset date). (Tr. 21). At Step Two, he found that Corrigan has the severe impairments of: "degenerative disc disease status post fusion at L4-5 and bilateral carpal tunnel syndrome status post carpal tunnel release on the right." (*Id.*). At Step Three, he found that Corrigan's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 23).

The ALJ then found that Corrigan retains the residual functional capacity ("RFC") to perform sedentary work, with the following additional limitations: only stand for up to fifteen minutes and sit for up to twenty minutes while remaining at the workstation; only occasional pushing and pulling with the bilateral upper extremities and operation of foot controls bilaterally with the lower extremities; no balancing, stooping, kneeling, crouching, crawling, or climbing of ropes, ladders, or scaffolds; only occasional climbing of ramps or stairs; only frequent reaching, reaching overhead, and handling bilaterally; must avoid exposure to excessive vibration, use of unguarded moving mechanical parts, and unprotected heights; and limited to simple, routine tasks. (*Id.*)

At Step Four, the ALJ determined that Corrigan is unable to perform any of her past relevant work. (Tr. 32). At Step Five, the ALJ concluded, based in part on the VE's testimony, that prior to July 30, 2015, Corrigan was capable of performing a significant number of jobs that existed in the national economy, but beginning on July 30, 2015, because of her advanced age, "a

4

finding of 'disabled' is reached by direct application of Medical-Vocational Rule 201.14" (*i.e.*, Corrigan "gridded out"). (Tr. 32, 34). The ALJ thus found that Corrigan was not disabled under the Act prior to July 30, 2015, but became disabled on that date and continued to be disabled through the date of the decision. (Tr. 34).

### C.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an

5

examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**D.     Analysis**

In her motion, Corrigan makes two arguments: (1) that the ALJ erred in determining her RFC, particularly in the weight he gave the medical source opinion evidence, and (2) that the ALJ failed to properly evaluate her credibility. (Doc. #10-2 at 12, 19). Each of these arguments is addressed below.

### 1. The ALJ's Decision to Give "Little Weight" to the Majority of the Restrictions Contained in Dr. Howard Hurt's Opinion Is Not Supported by Substantial Evidence

On September 3, 2014, Corrigan's primary care physician, Dr. Howard Hurt, filled out a "Disability Impairment Questionnaire" similar to an RFC assessment. (Tr. 335-339). After

6

noting his history of treating Corrigan, and that she was not "a malingerer," Dr. Hurt opined that because of Corrigan's lumbar disc degeneration and carpal tunnel syndrome, she was in "constant" pain, which was aggravated by prolonged standing or sitting, and could only sit for fifteen minutes at a time, could only lift five to ten pounds occasionally, would need to take numerous unscheduled breaks in an eight hour work day, and would miss work two to three times a month. (*Id.*). He also opined that she could work for less than one hour in a seated position in an eight hour work day, and work for less than one hour standing or walking in an eight hour workday. (Tr. 337). Importantly, Dr. Hurt noted that Corrigan's "symptoms will likely increase if [she] were placed in a competitive work environment." (Tr. 338). He related these limitations back to January 20, 2014. (Tr. 339).

Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the

7

opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)) (ALJ must "give good reasons" for weight given to treating source opinion); *see also DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 728 (6th Cir. 2014) ("[t]he lines of demarcation [as to what constitutes good reasons] are not clear, and in the vast majority of cases, a position defending a final administrative decision despite its imperfections will be justified.").

Here, the ALJ gave great weight to only a small portion of Dr. Hurt's opinion – specifically, the limitation that Corrigan could sit for no more than fifteen minutes at a time before needing to change positions. (Tr. 30-31). The ALJ gave "little weight" to the "rest of the limitations expressed by Dr. Hurt" because he found those limitations were "not consistent with the medical evidence of record or [Corrigan's] activities of daily living." (*Id.*). At least without additional analysis of the medical evidence and testimony discussed below, the Court cannot find that the ALJ gave "good reasons" for rejecting the majority of the limitations imposed by Dr. Hurt, or that that aspect of his decision is supported by substantial evidence.

**Medical Evidence**

As of January 20, 2014 – Corrigan's alleged onset date – she was working as a head cook at a senior center. However, it appears she was not doing so on a full-time basis (or at least had not been working full-time for very long), because of prior issues with her back. In May 2013, Corrigan began complaining of acute back pain. (Tr. 361-62). She saw Dr. Hurt on May 14 and 29, 2013 (Tr. 362), and he ordered an MRI, the results of which the ALJ accurately summarized as follows:

> A May 2013 MRI of [Corrigan's] lumbar spine showed degenerative disc disease at L1-2, L3-4, and L4-5. It also revealed a broad-based disc bulge with superimposed interforaminal mild disc herniation at L4-5, bilateral facet arthorpathy at L4-5, and mild spinal stenosis at L4-5. There was also

> mild bilateral facet arthropathy at L5-S1, mild spinal stenosis at L3-4, and mild interforaminal disc herniation at L3-4. A July 2013 CT of [Corrigan's] lumbar spine showed moderate degenerative changes mostly affecting lower lumbar facets.

(Tr. 22 (internal citations omitted), 258, 356).

On June 4, 2013, Corrigan sought medical attention after being unable to get out of bed and experiencing "stabbing pain" and muscle spasms, with her greatest pain level being a 9 out of 10. (Tr. 316). Corrigan indicated that her pain was relieved by Icy Hot packs, ice packs, and lying down. (*Id.*). She reported "pain with sitting or riding in the car" which she could only tolerate for 10 minutes. (Tr. 317). On June 24, 2103, Corrigan saw Dr. Naman Salibi, M.D. She relayed the incident where she had been unable to get out of bed, which landed her in the emergency room, and said that the Robaxin she had been prescribed had worked for only about 1-2 weeks. (Tr. 283-84). Corrigan had missed two weeks of work, but then returned to her job on a reduced schedule of 3 days a week, 3 hours per day. (*Id.*). However, she could only sit for up to 15-20 minutes, and although she had good strength in her extremities, her straight leg raising test was positive, with back pain at 90 degrees bilaterally. (*Id.*).

Corrigan then began doing physical therapy, and was still working months later; thus, when she met with Dr. Hurt on July 15, 2013, she told him that she was doing well, had returned to work, and felt independent at home. (Tr. 271). A treatment note from August 21, 2013, indicates that Corrigan "participated well in a total of 9 physical therapy visits" and "participated well with physical therapy. . . . She is looking forward to returning to work full time where she works as a head cook." (Tr. 314). However, she was still only working on a part-time basis of 3 hours a day, 3 days a week, and on this particular day, when she tried to work more hours, she experienced lower back pain. (*Id.*).

It is unclear from the record how Corrigan fared during the next few months, but

9

evidence shows that her back took a turn for the worse right around the time of her January 20, 2014 alleged onset date. A January 17, 2014 lumbar spine MRI showed a mild to moderate subligamentous herniated disc at L4-L5 which caused minimal compression of the thecal sac. (Tr. 273). On January 22, 2014, Corrigan presented to the ER complaining of "continuous" "[s]evere low back pain onset again." (Tr. 263). A February 17, 2014 treatment record noted that Corrigan had "recently underwent acute exacerbation of low back," but that it "significantly diminished since she has discontinued working." (Tr. 282). On March 27, April 10, and April 24, 2014, Corrigan's medical records indicate that she experienced greater pain with sitting; she was diagnosed with lumbosacral spondylosis; and she was given epidural steroid injections at L4/L5 of the lumbar spine. (Tr. 323-334). The records also show her complaining of lower back pain that was "aching, throbbing, cramping, and shooting and is constantly presently and is worse in the morning and evening." (*Id.*). While sitting made the pain worse, Corrigan reported to her doctor that lying down eased the pain. (*Id.*). While Corrigan did show full range of motion of the lumbar spine without pain at each doctor's visit, she also had positive straight leg raising tests and positive cross straight leg tests. (*Id.*).

Corrigan appears to have visited the ER again around May 29, 2014, complaining of acute low back pain and severe muscle spasms at L-5/S-1 with decreased range of motion after a two-hour car ride. (Tr. 269-70). She was prescribed Norco, and ordered to undergo a lumbar spine x-ray. (*Id.*). Although her pain was "somewhat decreased" about two weeks later when she again saw Dr. Hurt, she still had a positive straight leg raising test, and was referred to a neurosurgeon. (Tr. 267).

On December 6, 2014, Corrigan saw Dr. Jayant Jagannathan for a neurological consultation. (Tr. 351). Dr. Jagannathan wrote that Corrigan presented that day with

10

"intractable back pain," and his review of Corrigan's imaging studies revealed disc degeneration, mild lumbar stenosis at L4-L5, and a left foraminal disc protrusion at L3-L4 secondary to interforaminal disc herniation. (*Id.*). Dr. Jagannathan noted that "a variety of conservative treatments" had failed to cure Corrigan's back pain. (*Id.*). Dr. Jagannathan recommended an EMG and surgery based on the results, concluding that "the source of the pathology is likely at L4-5 where there is some central stenosis." (*Id.*).

About two weeks later, on December 19, 2014, Dr. Jayant Jagannathan performed a significant spinal surgery on Corrigan, which included L4-L5 transforaminal lumbar interbody fusion, right-sided L4-L5 laminectomy, foraminotomy, and facetectomy, with hardware. (Tr. 349-350). During the surgery, the doctor noted that the "thecal sac did appear to have adherent ligamentum as well as facet athropathy which was causing local stenosis." (*Id.*).

Although Corrigan seemed to do reasonably well with the physical therapy that followed her fusion surgery – sometimes noting improvement, sometimes not (Tr. 516, 518, 520, 522) – on June 10, 2015, she returned to see Dr. Jagannathan for an MRI because she was experiencing continued pain. (Tr. 530). Based on this MRI, Dr. Jagannathan found a circumferential disc bulge causing mild spinal canal narrowing at the T11-12 level, as well as a superimposed small central disc protrusion. (*Id.*). He also noted disc bulges at the L3-4 and the L4-5 levels, as well as facet degenerative changes at L1-2, L2-3, L3-4, and L4-5. (*Id.*). Finally, Dr. Jagannathan noted minimal clumping of the nerve roots within the thecal sac at the posterior aspect of L5 and L4-5 disc space. (Tr. 531).

### Corrigan's Testimony

Corrigan testified at the administrative hearing that she stopped working at her last job as a cook on January 20, 2014, because her back "gave out" on that date. (Tr. 51). When the ALJ

11

asked, "did you quit, were you fired, how did the job end?," Corrigan responded,

> I quit, Your Honor. Back in May of 2013, my back started spasming . . . just out of the blue. And I was off work . . . for two months. And I went back to work, and I was there for five months, and my back gave out on me again.

(*Id.*). When the ALJ asked Corrigan what was keeping her from working, she testified:

> Pain in my back, and it radiates down my hips into my legs. My hands, I have carpal tunnel in both hands. I had surgery done on the right in June, and it's still not 100% in strength. And I'm still waiting to have the left one done as soon as the right one is 100%. But my main complaint is the constant pain in my back, Your Honor.

(Tr. 54).

Corrigan testified that she takes Gabapentin daily, and Norco "most every day" to address her pain. (Tr. 56-57). She also takes Robaxin for muscle spasms a few times a week. (*Id.*). The ALJ then mentioned Corrigan's back and carpal tunnel surgeries, and asked her if she was currently engaged in any physical therapy. (Tr. 58). Corrigan answered that she was doing aquatic therapy for her back and occupational therapy for her hand. (Tr. 59). Corrigan also testified that she needs to ice her back four times a day, for twenty minutes at a time. (*Id.*). The ALJ and Corrigan then engaged in the following back-and-forth regarding the efficacy of her spinal fusion surgery:

> Q. And, you know, I read with interest, the treatment notes that you have with Dr. Jagannathan. It looked like initially he was assessing that you had done well. And he did an MRI and X-rays of your back, and the hardware was where it was supposed to be, and everything was – to them, looked fine.
>
> A. Correct.
>
> Q. And but you were telling them that it wasn't fine.
>
> A. No.
>
> Q. So why don't you explain that to me?

12

> A. I was still in pain, Your Honor, after surgery. I got relief for like the first couple months after surgery. The leg pain and stuff was gone after the surgery for about the first two months. I started physical therapy. And during physical therapy, my legs and my feet were going numb, so they physical therapist told me that I needed to go back and see the surgeon. So I did that. I went back and [saw] Dr. Jagannathan, and he set me up with aquatic therapy. And I went through aquatic therapy. And they discharged me from that because it wasn't – the pain was not getting any better.

(Tr. 60).

Corrigan's attorney then pointed out to the ALJ that an "MRI from June 2015 [i.e., about six months after her fusion surgery], doesn't really show normal findings, [it shows] disc bulge, and the clumping of nerve roots …." (Tr. 61; *see supra* at 12). Corrigan added that "I'm having numbness in my legs and my feet. And the pain is back in my legs, where it's like electric shock going down both legs, and into my pelvic and to my tailbone." (*Id.*). The ALJ asked why she chose not to treat those symptoms with injections, to which Corrigan responded, "[the doctor] did offer me to go have more injections done. But I do not want to do injections again. I went through all the injections before, and it didn't do any good. And that's why I ended up in – having surgery. (Tr. 62).

When the ALJ asked Corrigan at the hearing about her typical day, she testified:

> I get out of bed usually between 7:00 and 9:00, depending on what kind of night I've had. I get coffee, take my morning medicine. Just kind of relax, watch some TV. Get in the shower. I have to ice my back, like I said, four times a day, for 20 minutes a day right now, and do my stretches. I normally eat lunch between 11:00 and 1:00. . . . And I try to do some light housework, like dusting. I can do some dusting. I try to do the dishes, but not always – you know, I don't always succeed at that . . . usually lay down with the icepack on my back, probably – well, like I said, at least four times a day. But then at night I have the icepack on me probably for a majority of the night, on and off, to relieve pain. That's about all I do, Your Honor.

(Tr. 63-64).

Corrigan testified that she does not go out by herself and cannot babysit her

13

grandchildren because she is unable to lift them. (Tr. 64). She testified that she is unable to do things out of the house, like gardening and going to church. (Tr. 64-65). Corrigan testified that she would work if she was able, but that she had not applied for even part-time work because, "There's no way I can work. Just doing little things around the house, it puts me right on the couch with an icepack." (Tr. 65).

**Application to the ALJ's Finding**

While the ALJ gave "great weight" to "Dr. Hurt's limitation that [Corrigan] could only sit for 15 minutes at a time before needing to change positions," he gave "little weight" to the rest of the opinion's limitations because they purportedly were "not consistent with the medical evidence of record or [Corrigan's] activities of daily living." (Tr. 30). In the sentences that followed the ALJ's statement, he discussed a few of Corrigan's medical records, some of which the Court acknowledges showed "normal" or "minimal" findings. However, this discussion essentially ignored the plethora of evidence discussed above in which the findings were much more severe. For example, the ALJ noted an instance where Corrigan had a negative straight leg raise test, but did not mention the many times when this test was positive. (Tr. 31). And, while the ALJ's decision mentions Corrigan's fusion surgery, he never meaningfully analyzed it in the context of Dr. Hurt's opinion (which predated the surgery by only a few months). (Tr. 30-31). Finally, as discussed above, although Corrigan achieved some temporary relief from the surgery, the above evidence – including objective medical tests (Tr. 530-31) – shows that her back problems returned.[1] Accordingly, while the ALJ in this case provided a through and detailed summary of the medical records, the Court cannot find that his conclusion that the limitations imposed by Dr. Hurt are "not consistent with the medical evidence of record" (Tr. 30) is

---

[1] Moreover, whereas the ALJ limited Corrigan to a sedentary job, medical records reflect a concern that sitting made her pain worse. (*E.g.*, Tr. 269-270, 323-34).

14

supported by substantial evidence.

Similarly, as to Corrigan's activities of daily living, the ALJ's findings failed to address her testimony about needing help to perform some activities, her inability to do many others, and her need to lay down multiple times during the day and to ice her back, which testimony finds support in the medical records. (Tr. 30-31, 393 (3/26/15 medical record noting "continued pain and weakness core stability activity," and "continued difficulty with mobility tasks and independent completion of ADLs"); 401 ("mild difficulty with core stability exercises [] and requires frequent rest breaks."); 405 (noting that Corrigan's husband "assist[s] her with activities around the house"); 323-34 (pain decreased by lying down and applying ice packs). On remand, the ALJ should thoroughly explain whether, and to what extent all of the foregoing weighs on the supportability of Dr. Hurt's opinion.

### 2. The ALJ's Credibility Determination is Not Supported by Substantial Evidence

In determining Corrigan's RFC, the ALJ summarized her alleged limitations and determined that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms"; however, he found her statements concerning the "limiting effects of these symptoms" not entirely credible. (Tr. 24). Therefore, the ALJ declined to find Corrigan's "allegations that she is incapable of all work activity [] fully credible because of significant inconsistencies in the record as a whole." (*Id.*).

The Sixth Circuit has held that determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not

15

be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul. 96-7*, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529. Here, as discussed below, many of the ALJ's assertions about inconsistencies are not supported by substantial evidence, while other areas which would tend to support Corrigan's credibility went unmentioned by the ALJ.

The Court starts with the latter point. The medical records and Corrigan's work history seem to dovetail together in a way that supports her subjective testimony that after her alleged onset date, she was unable to work in a competitive position – or even in a part-time position, for that matter. On multiple occasions, Corrigan's doctors took her off work due to her back problems, yet she returned to her job, albeit on a reduced schedule, and has consistently expressed a desire to work. *See supra* at 9-10; *see also* Tr. 65, 374 (6/4/13 physical therapy treatment note stating Corrigan's goal was to "get back to work as soon as possible."), 377 (6/28/13 physical therapy note ("She is looking forward to returning to work full time where she works as a head cook.")). Yet, the ALJ did not discuss how this significant and consistent history bore on his credibility determination. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (noting that an additional factor supporting the claimant's credibility was that she

16

had a 17 year work history); *Wilcoxson v. Comm'r of Soc. Sec.*, 2016 WL 878036, at *4 (W.D. Mich. Mar. 8, 2016) (the ALJ properly considered the plaintiff's work history, noting that the plaintiff "had a steady and consistent work record for nearly 40 years, which indicates good work motivation").

The ALJ also seemed to question the impetus for Corrigan's spinal fusion surgery, writing, "[o]n December 7, 2014, [Dr. Jagannathan] discussed with [her] continuing with conservative treatment, but [Corrigan] was keen on having surgery." (Tr. 28). However, medical records show that Corrigan was recommended to see Dr. Jagannathan about a possible spinal surgery, and that Dr. Jagannathan, after noting that "a variety of conservative treatments" had failed to cure Corrigan's back pain, did in fact recommend an EMG and surgery based on the results. (Tr. 267, 351). Moreover, after going on and off work over a lengthy period of time due to "intractable" back pain despite multiple rounds of conservative treatment (*i.e.*, the numerous physical therapy visits and injections reflected in the record), it is understandable that Corrigan would want to pursue an alternative approach, even if it meant an invasive surgery. (Tr. 351). This also highlights an issue with the ALJ's decision to discount Corrigan's credibility because he found that her "[conservative] treatment [was] generally successful in controlling [her] symptoms." (Tr. 27). While it is true that Corrigan achieved some immediate and temporary relief from her conservative treatment, it seems incongruous to characterize that treatment as "generally successful" when the end result was a spinal fusion surgery (which itself was not fully effective in treating Corrigan's back issues). (Tr. 530-31).[2]

---

[2] In the same paragraph where the ALJ made this finding, he also noted that "[o]n July 31, 2013, [Dr. Salibi] did not recommend any surgical intervention and only recommended that [Corrigan] continue with conservative management." (Tr. 28). Yet, as discussed above, Corrigan not only followed this recommendation, but returned to work because, *at that time*, *prior to her alleged onset date*, the conservative treatment was generally successful. *See supra* at 8-10. Again, the

17

Finally, as discussed above, the ALJ's discussion of Corrigan's daily activities failed to take into account her testimony about needing help to perform some activities, her inability to perform many other activities, and her need to lay down multiple times during the day and to ice her back, much of which testimony finds support in the medical records. *See supra* at 15.

For all of these reasons, the Court cannot find that the ALJ's credibility determination is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(Doc. #12)** be **DENIED**, Corrigan's Motion for Summary Judgment **(Doc. #10)** be **GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: August 7, 2018  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any

---

sequence of her treatment, culminating in a fusion surgery that still did not remedy her back impairment, seems to support, rather than detract from her credibility.

further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 7, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
